[Cite as *State v. Warnick*, 2020-Ohio-4240.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MIAMI COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2019-CA-14 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2018-CR-566 |
| v. | : | |
| | : | (Criminal Appeal from |
| JAMES C. WARNICK | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 28th day of August, 2020.

. . . . . . . . . . .

PAUL M. WATKINS, Atty. Reg. No. 0090868, Miami County Prosecutor's Office, Safety Building, 201 West Main Street, Troy, Ohio 45373
  Attorney for Plaintiff-Appellee

HILARY LERMAN, Atty. Reg. No. 0029975, 249 Wyoming Street, Dayton, Ohio 45409
  Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After the trial court overruled his motion to suppress, James C. Warnick pled no contest to felony counts of aggravated possession of drugs and improper handling of a firearm in a motor vehicle and to two misdemeanor counts of possession of drugs. Warnick appeals from his conviction, claiming that the trial court erred in denying his motion to suppress.   For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} The evidence at the suppression hearing consisted of the testimony of two Ohio State Highway Patrol (OSHP) troopers, a photograph of Warnick's vehicle, and a cruiser video.   The trial court found the troopers to be experienced and their testimony to be credible.   The evidence at the hearing established the following facts.

{¶ 3} At 7:17 a.m. on August 5, 2018, Trooper James Davis was at his OSHP post when the patrol received a telephone call stating that a vehicle with a shattered windshield was parked in the southbound Interstate 75 rest stop and the driver was slumped, unconscious, over the steering wheel.   The caller was not identified.   Within minutes, Trooper Davis and a second trooper, Jordan Monnin, responded to the rest stop near milepost 81 in Miami County in separate cruisers.   Davis testified that they "were responding to the possibility that someone was ill or injured."   (Supp. Tr. at 27.)   Trooper Monnin's cruiser camera was activated as he drove on I-75 toward the rest stop.

{¶ 4} Upon arriving, the troopers observed a 2005 Dodge pickup truck that was backed into an angled parking space.   The truck had a shattered windshield with large holes in it; Trooper Davis described the windshield as consisting of two panes of glass. The roofline of the truck also was dented.   The driver, later identified as Warnick, was in

the driver's seat, unconscious or asleep. Officer Monnin's initial thought was that the vehicle had been in a crash, the driver was impaired, and the driver had gotten the vehicle "as far as they could and pulled over and possibly passed out or fell asleep in the vehicle." (Supp. Tr. at 30.)

{¶ 5} The troopers conferred and decided to put a tire deflation device in front of one of the tires. Monnin explained that the device was for officer safety; they had concerns that the driver might try to flee while impaired and a pursuit would ensue. Trooper Davis noted that it was unusual for people to back into rest area parking spaces, as they are angled for vehicles to pull into them. Trooper Davis retrieved a stop stick from the trunk of his cruiser and placed it under the front driver's side wheel.

{¶ 6} Trooper Davis went to the passenger side of the vehicle while Trooper Monnin went to the driver's side and knocked on the driver's window. Warnick woke, and Monnin saw him immediately reach toward the ignition. Monnin opened the driver's door and asked Warnick what was going on. Warnick responded that he was taking a nap. Monnin next asked about the windshield. Warnick stated that a tree branch had fallen on the truck a few days before, and he was driving to get a new windshield. Monnin asked Warnick where he was living, and Warnick provided his address; he was not able to produce his ID. Trooper Monnin then asked Warnick to exit the vehicle. Warnick got out, leaving the driver's door open.

{¶ 7} Warnick was wearing baggy camouflage pants and a black tank top. Trooper Monnin noticed that Warnick had an empty sheath for a machete hooked onto his belt. When Monnin asked Warnick about the weapon, Warnick said that it was in the truck, but was broken. Monnin removed the sheath, handed it to Davis, and Davis tossed

it back into the truck.  Trooper Monnin decided to pat down Warnick for officer safety. Monnin found a Bic lighter, a butane torch, and two cell phones, one of which was taped together, on Warnick's person.   The troopers did not take the items from Warnick.   While patting him down, Monnin noticed that Warnick's fingers were cut.

{¶ 8} At 7:25 a.m., the troopers placed Warnick in Monnin's cruiser.   Both troopers testified that Warnick was subject to an investigative detention at this point.   They explained the bases for the detention, noting the positioning of Warnick's vehicle, the condition of the vehicle, and Warnick's nervousness.   The troopers did not detect any odor of alcohol on Warnick, Warnick was not wobbly or unsteady, and he answered questions coherently and without slurring his speech.   The troopers indicated, however, that they did not explore whether Warnick was impaired due to the rapid progression of the stop.

{¶ 9} As Trooper Monnin questioned Warnick in the cruiser, Trooper Davis inspected the open driver's side door for the vehicle's VIN number and, standing in the open doorway, looked into the vehicle for items in plain view.   Davis saw a glass pipe with a bulbous end, a bag with a white crystal substance, and ammunition strewn about the console and ashtray.   Davis testified that he was able to view these items without entering the vehicle.   Davis radioed Monnin about the ammunition that he observed, and Monnin asked Warnick if he had a firearm in the truck.   Warnick admitted that he did.

{¶ 10} Trooper Monnin informed Warnick of his *Miranda* rights.   Warnick subsequently stated that he did not have a concealed carry permit for the firearm. Warnick stated that the firearm was his grandfather's "antique rifle."   Trooper Davis entered the passenger side of the vehicle, where he found a firearm in the rear seat area.

Warnick told Monnin that he was not a convicted felon in Ohio. Monnin subsequently asked Warnick to hand him the butane torch and the taped cell phone. (Monnin had concerns that Warnick would use the butane torch to start a fire in the cruiser and that there might be contraband.) Within a couple minutes, Monnin placed Warnick in handcuffs.

{¶ 11} Warnick subsequently was charged with aggravated possession of drugs, improper handling of a firearm in a motor vehicle, and two counts of possession of drugs. The charges were based on Warnick's possession of a loaded Winchester Model 6122 caliber pump action rifle loose in his truck, 25.803 grams of methamphetamine, two Xanax pills, and two Clonazepam pills. (Plea Tr. at 22.) On May 28, 2019, Warnick moved to suppress the evidence obtained from the search of his vehicle. Warnick's motion argued:

> In the instant case, the state troopers were conducting a consensual encounter in order to determine whether Defendant was under any distress. Troopers turned the encounter into an investigatory detention when Defendant was effectively seized without a reasonable suspicion that Defendant had violated the law. Troopers were dispatched to conduct a welfare check on Defendant. Finding the Defendant in no distress, with no injuries, and not under the influence of any intoxicants, Defendant nonetheless was forcibly taken from his vehicle by troopers, frisked, and placed in the patrol car. Any reasonable person would not believe he was free to leave or terminate the encounter under such circumstances. Such seizure is unreasonable under the Fourth Amendment.

{¶ 12} The trial court overruled the motion. The court began by noting that, "[u]ntil Trooper Monnin placed the stop stick under Defendant's truck tire, the troopers were engaged in a consensual encounter and the Fourth Amendment was not implicated." Prior to placing the stop stick, the troopers had observed the damage to truck, the truck's position in the parking space, and the unconscious driver, which corroborated the phone tip. The trial court concluded that the observations reasonably led the officers to believe that the driver was impaired and in control of a vehicle, which warranted the investigatory stop, including the placement of the stop stick.

{¶ 13} The trial court further concluded that the troopers' continued detention of Warnick was reasonable. The court reasoned:

Although the troopers focused on the suspicion that Defendant was impaired, the condition of the vehicle's windshield rendered it unsafe to operate. Trooper Monnin testified that the windshield was damaged to the point where there were large holes in it, which is confirmed in State's *Exhibit 2* [a photograph of the truck]. R.C. 4513.02 prohibits operation of an unsafe vehicle, and damage to the windshield can render it unsafe to operate. * * * The damage was not a "slight crack" that is not a basis to stop the vehicle or detain the driver * * *. Instead, the damage was extensive and the truck was plainly unsafe to operate.

The troopers did not observe Defendant operate the unsafe vehicle, however, the location of the vehicle at a highway rest area raised a clear probability that Defendant drove the vehicle to the rest area. As the troopers began to investigate whether Defendant was impaired, Monnin

observed Defendant appear to reach for the keys in the ignition. Based on that gesture, it was reasonable for the trooper to remove Defendant from the vehicle to prevent him from operating the obviously unsafe vehicle, and pat him down for their own safety. * * * The Court finds that it was reasonable to detain the Defendant and the truck until the troopers determined that the truck would not be operated on the interstate in that condition. Trooper Monnin then observed an empty machete holder, and Defendant said the machete was in the vehicle albeit broken. Therefore, it was reasonable to place Defendant in the cruiser while the officer looked for the machete and continued his investigation into Defendant's possible impairment.

At the same moment Trooper Monnin's investigation was indicating that Defendant was not impaired, the basis to detain him had shifted to a search for the weapon. The condition of the vehicle and the suspicion that Defendant would drive it on the highway also justified his continued detention. * * *

{¶ 14} The trial court further concluded that, as Trooper Monnin continued to question Warnick in the cruiser, Trooper Davis saw, in plain view, a glass pipe, baggie with a crystal substance, and live ammunition in the truck. The court found that the incriminating nature was immediately apparent. The court found that these observations provided the troopers probable cause to search the vehicle, leading to the discovery of the rifle. The court thus found that Warnick's detention was reasonable under the Fourth Amendment, and the troopers had probable cause to search the vehicle and arrest Warnick.

{¶ 15} Soon after the trial court's ruling, Warnick pled no contest to the charged offenses. The trial court sentenced him to a mandatory four years in prison for aggravated possession of drugs, 17 months for improper handling of a firearm, and six months for each count of possession of drugs, to be served concurrently. The trial court also suspended Warnick's driver's license for four years and ordered him to pay $35 in restitution to the Ohio State Highway Patrol and $629.50 in court costs.

{¶ 16} Warnick appeals, challenging the denial of his motion to suppress.

## II. Review of Suppression Ruling

{¶ 17} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 18} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Whether a stop and/or search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining

the totality of the circumstances. *See State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 14.

{¶ 19} Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 20} In addition, under the community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement, a law-enforcement officer with objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury may conduct a community-caretaking/emergency-aid stop. *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 26; *State v. Klase*, 2019-Ohio-3392, 131 N.E.3d 1054, ¶ 16 (2d Dist.).

{¶ 21} Community caretaking functions are "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Accordingly, Ohio appellate courts generally have held that police officers are not required to possess reasonable articulable suspicion of criminal activity when exercising community caretaking functions/emergency aid. *E.g., State v. Pattin*, 10th Dist. Franklin No. 17AP-

575, 2018-Ohio-3876, ¶ 10; *State v. Norman*, 136 Ohio App.3d 46, 54, 735 N.E.2d 953 (3d Dist.1999).

{¶ 22} We agree with the trial court's assessment of the circumstances. The troopers responded to the rest stop on a report of a vehicle with a substantially damaged windshield and an unconscious driver. Upon arrival and prior to placing the stop stick, the troopers observed the vehicle and the driver, which led Trooper Monnin to reasonably believe that the driver might have been in a collision and impaired. The troopers acted reasonably in detaining Warnick for the purpose of ascertaining whether he was in need of medical attention.

{¶ 23} Moreover, the troopers had observed the windshield, which was shattered with large holes and appeared to be two panes of glass; the roofline of the vehicle also was dented. The vehicle was located at a rest stop, indicating that Warnick had driven to that location with the damaged windshield. Based on the visible condition of the vehicle, the troopers also reasonably detained Warnick for driving an unsafe vehicle. Accordingly, the troopers were justified in placing the stop stick in front of one of the wheels of Warnick's truck to prevent him from driving away until the questions regarding his and the truck's safety were resolved.

{¶ 24} After stopping a motorist for a traffic violation, a police officer may order the motorist to get out of his car, even without suspicion of criminal activity. *State v. Dozier*, 187 Ohio App.3d 804, 2010-Ohio-2918, 933 N.E.2d 1160, ¶ 8 (2d Dist.), *citing State v. Evans*, 67 Ohio St.3d 405, 407, 618 N.E.2d 162 (1993) and *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Additionally, "[d]uring a routine traffic stop, it is reasonable for an officer to search the driver for weapons before placing the

driver in a patrol car, if placing the driver in the patrol car during the investigation prevents officers or the driver from being subjected to a dangerous condition and placing the driver in the patrol car is the least intrusive means to avoid the dangerous condition." *State v. Lozada*, 92 Ohio St.3d 74, 748 N.E.2d 520 (2001), paragraph one of the syllabus.

**{¶ 25}** Still, neither a *Mimms* order to exit the vehicle nor the act of placing the motorist in a police cruiser automatically entitles an officer to pat the driver down for weapons. *Dozier* at ¶ 8, *citing* Evans at 409. "During the course of an investigatory stop and detention, law enforcement officers may conduct a pat down search for weapons if the officers have reasonable grounds to believe that the suspect is armed and dangerous." *State v. Keggan*, 2d Dist. Greene No. 2006-CA-9, 2006-Ohio-6663, ¶ 26. "The officer need not be absolutely certain that the individual is armed; rather, the issue is whether a reasonably prudent man in those circumstances would be warranted in the belief that his safety or the safety of others was in danger." *State v. Grefer*, 2d Dist. Montgomery No. 25501, 2014-Ohio-51, ¶ 24.

**{¶ 26}** Having lawfully detained Warnick, Trooper Monnin was permitted to ask Warnick to exit his truck. The request was further supported by Warnick's apparent reaching for the ignition. After Warnick exited his vehicle, Trooper Monnin noticed that Warnick wore an empty sheath for a machete. Warnick acknowledged that he had the knife in the vehicle, although he claimed it was broken. Both troopers also commented that Warnick was acting nervous, which made the troopers apprehensive. At that juncture, Trooper Monnin had a reasonable articulable suspicion that Warnick was armed and dangerous, justifying the patdown for weapons.

**{¶ 27}** Immediately after the patdown, Warnick was placed in Trooper Monnin's

cruiser for additional questioning, beginning with his name. At the same time, Trooper Davis looked at the driver's door of the truck for the VIN number and observed a drug pipe, a crystal substance, and ammunition in the vehicle.

{¶ 28} Under the plain view doctrine, a warrantless seizure of incriminating evidence is permissible where "(1) the officers are lawfully positioned in a place from which the object can be plainly viewed, (2) the incriminating character of the object is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *State v. Goode*, 2d Dist. Montgomery No. 25175, 2013-Ohio-958, ¶ 26, citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) and *Horton v. California*, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

{¶ 29} When Warnick exited the vehicle, the driver's door remained open. Trooper Davis was standing in the open doorway when he observed the drug pipe, white crystal substance, and ammunition. Davis testified that he was able to view these items without entering the vehicle. The trial court did not err in concluding that the items were in plain view.

{¶ 30} Under the automobile exception, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband, and exigent circumstances necessitate a search or seizure. *State v. Mills*, 62 Ohio St.3d 357, 367, 582 N.E.2d 972 (1992); *Maryland v. Dyson,* 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.E.2d 442 (1999). A vehicle's mobility is the traditional justification for this exception to the warrant requirement. *Mills* at 367; *Dyson* at 467. "[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment * * * permits police to

search the vehicle without more.' " *Dyson* at 467, quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). Generally, "[t]he immobilization of the vehicle or low probability of its being moved or evidence being destroyed does not remove the officers' justification to conduct a search pursuant to the automobile exception." *State v. Russell*, 2d Dist. Montgomery No. 19901, 2004-Ohio-1700, ¶ 34. *See Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982).

{¶ 31} Under the automobile exception, Trooper Davis was justified in entering Warnick's truck to seize the drug pipe and the white crystal substance from the vehicle. Moreover, prior to Davis's entering the truck, Warnick also admitted that he had a firearm in the vehicle, which provided probable cause for Davis to believe that Warnick was unlawfully transporting a firearm. The trooper was permitted to enter the vehicle to secure the weapon.

{¶ 32} On appeal, Warnick argues that the troopers should have provided him his *Miranda* rights upon initiating the investigatory detention, i.e., when they placed the stop stick under his tire. In order to ensure that a person's Fifth Amendment right against self-incrimination is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. It is well established that individuals involved in temporary investigatory detentions, such as routine traffic stops, are not "in custody" for purposes of *Miranda. Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *State v. Bizzell*, 2017-Ohio-8902,

100 N.E.3d 1267, ¶ 14 (2d Dist.).

{¶ 33} From the time the troopers placed the stop stick under Warnick's tire to when he was handcuffed, Warnick was subject to an investigatory detention, but he was not in custody.   Thus, the troopers were not required to inform Warnick of his *Miranda* rights during that time.   We note that Trooper Monnin told Warnick his rights after Trooper Davis notified him (Monnin) of the items found in plain view and Warnick admitted that he had a gun in the vehicle.

{¶ 34} In summary, the trial court did not err in denying Warnick's motion to suppress.   Accordingly, Warnick's assignment of error is overruled.

### III. Conclusion

{¶ 35} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Paul M. Watkins
Hilary Lerman
Hon. Jeannine N. Pratt